NO. **773-15**

IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS

CASE No. 07-13-00156-CR
PD-0773-15

ORIGINAL

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 16 2015

Abel Acosta, Clerk

AUSBON OSBORNE,
Appellant

V.

THE STATE OF TEXAS
Appellee

---

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

---

On Appeal from the
396th Judicial District Court
Tarrant County, Texas
Trial No.1316584R

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2015

Abel Acosta, Clerk

In Appeal No.07-13-00156-CR
from the
Court of Appeals
for the Seventh District of Texas
Amarillo, Texas

Ausbon Osborne #1853817
Hodge Unit
379 FM 2972 W
Rusk, TX 75785

NO._____

IN THE
COURT OF CRIMINAL APPEAL'S
OF TEXAS

Ausbon Osborne
Appellant

VS.

The State of Texas
Appellee

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

TO THE COURT OF CRIMINAL APPEALS OF TEXAS:

Appellant respectfully submits this petition for Discretionary Review and moves that this Honorable Court grant review of this cause and offers the following in support thereof:

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant requests oral argument in this cause because such argument may assist the Court in applying the facts to the issues raised. It is suggested that oral argument may help simplify the facts and clarify the issues.

## STATEMENT OF THE CASE

The state initially charged Appellant in a one-count February 24, 2012 indictment in Cause No. 1255657; it alleged that Appellant inserted his finger into complainant's sexual organ on July 29, 2009. The State added three counts under an indictment in Cause No. 1316584R that was filed on February 28, 2013. The three additional counts alleged that Appellant on or about July 29, 2009 penetrated or contacted compainant's female sexual organ with his penis, touched her sexual organ, and caused her bodily injury. The conviction on all four counts under The February 28, 2013 indictment are before this Honorable Court of Criminal Appeals.

## STATEMENT OF PROCEDURAL HISTROY

In cause No. <u>1316584R</u> THE Appellant was convicted with the offense of <u>four counts of Aggravated Sexual Assault</u>. The Appellant was convicted of such offense on <u>April 9, 2013</u> and appealed the conviction. (On <u>April 12, 2013</u>). On May 29, 2015 the Amarillo Court of Appeals affirmed the conviction. No motion for rehearing was filed. On *8·27·15* this Petition for Discretionary Review was timely forwarded to the Court of Criminal Appeals for filing pursuant to Rule 9.2(b), Texas Rule of Appellant Procedure.

## GROUNDS FOR REVIEW

### I.

### INSUFFICIENT EVIDENCE

The evidence was insufficient to support the conviction because there was no rational basis for concluding that Appellant acted more then recklessly, and because Appellant had a parental purpose. The evidence was insufficient to prove any of the counts under a rigorous assessment of the qualitative value of the evidence. One important consideration was that complainant falsely accused her stepfather (Randels) of similar abuse two years earlier. *The charges against Randels were dismissed in September of 2008. Complainant gave a tricky forensic interview alleging that Appellant committed offense in question before this Honorable Courts review. CPS Investigator Jerald Henderson was the only witness who attributed an admission to Appellant in order to corroborate complainant's allegation about Sexual Abuse in question, CPS Investigator did no such recordings in his efforts to obtain the evidence such as phone calls and certain specific interview in regards to the evidence that was used in the conviction of Appellant, by witness CPS (Henderson).

*1*

## INSUFFICIENT EVIDENCE

1.)  Complainant accused her mother's boyfriend of sexual abuse in 2008, but the charges were dismissed.  Complaiant accused live-in boyfriend, Demarcus Carter in a December 2010 investigation of physical abuse.

2.)  Draper is Appellant wife, Draper took complainant to the hospital, where they said that nothing was wrong with complainant.

3.)  Appellant referance to his girlfriend son meant referance to Ausbon Jr, his five year-old boy with Jennifer White.

4.)  Detective Henz told the jury that the he reviewed the videotape of complainant's forensic interview, which was not shown to the jury, but he omitted that complainant went into detail about the day when Jennifer White found complainant acting out with Appellant's five year-old son Ausbon Jr, which precipitated being confronted and checked by Appellant.

5.)  Appellant explained in his interview with Detective Henz that Appellant acted with parental intent, and the testimony from the State witness that Appellant was "checking" complainant could be rationally characterized as supportive of Appellant's explaination.

6.)  The trial Court erred in refusing a medical instruction, even though the parent-defendant indicated suspicion of sexaul abuse. Appellant indicated a medical purpose; he was concerned that complainant might even need a shot if she were pregnant.

7.)  Detective Henz was incorrect that Appellant lacked support for his parenting theory, since complainant discussed her acting-out episode in detail. (APX &8).

8.)  Complainant made various statements that would have been contradicted by Jennifer White.  Complainant did not report abuse to Jennifer did not see Appellant penetrate complainant with his penis; and Jennifer and others saw or were present when complaint checked complainant by looking at her only.

9.)  During her forensic interview, Dula asked complainant at two different points during the interview whether complainant was really telling the truth.  Dula was confused by complainant's inability to consistently describe two specific events.

10.)  Complainant's testimony at trial about "white stuff" was new; she did not mention anything about white stuff in her forensic interview, much less in her statements to any of the State witnesses.

11.)  Failed to use complainant's videotape recantation; The video and a transcript of it also could have been used to confront State witnesses for their incomplete and biased investigation.  The video and transcript would have particularly supported a challenge the forensic interview's claims that she did not express substantial confusion during her interview of complainant.

2

# I.

## INSUFFICIENT EVIDENCE

12.) Failed to use complainant's forensic interview to demonstrate the validity of Apellant's concerns about complainant acting-out in a sexual manner with Appellant's five year-old son. Yet it was true that there was a problem with complainant's acting-out which lead to Appellant examining complainant, as complainant explained in detail during her forensic interview.

13.) Failure to use the video of her forensic interview and an associated trancript to show that Appellant's concerns about complainant acting out were valid was substandard conduct that rendered the outcome unreliable, in combination with the other vital evidence that was not presented in Appellant's behalf.

14.) Failed to use complainant's forensic interview to better impeach the forensic examiner, complainant's explainations were so confusing and suspicious that the forensic interviewer, Dula, twice asked whether the claimed abused "really did happen,"..

## GROUNDS FOR REVIEW

## II.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant was deprived of his Sixth Amendment right to the effective assistance of counsel with respect to his trial on guilty or innocence as to aggravated sexual assault by digital penetration as alleged under the indictment on allfour counts, because trial counsel a) suffered hearing impairment, b) failed to use complainant's videotaped recantation, c) failed to use complainant's forensic interview to demonstrate the validity of Appellant's concern about complainant acting-out, d) failed to use complainant's forensic interview to better impeach complainant, e) failed to use complainant's forensic interview to better impeach the forensic examiner, f) failed to call complainant's step-mother to testifiy that she did not witness abuse or hear any outcries, g) allowed the State to abuse the outcry exception, h) allowed the State to offer opinions on ultimate facts, i) failed to present complainant's inconsistencies in argument, j) failed to obtain a medical instruction, k) failed to have Appellant examined by a professional mental health (Doctor) to determine if the Appellant was in fact competent to stand trial.

This Appellant is currently in the determination of disability program in Rusk, TX. This program is called the (MROP) which stands for Mentally Retarded Offender Program. Appellant's intellectual and adaptive functioning level in regards to his IQ level is so low his trial counsel should have had this Appellant examined by professional MH/MR Doctors to address being mentally competent to stand trial. During Appellant's trial proceedings, Appellant stated to trial counsel "he did'nt understand the things that were going on".

It is the contention of this Appelant that the jury that convicted him was bias, the appellant argument is there was only one African American on his jury.

3

## Statement of Case

Complainant lived with Appellant in Arlington and Fort Worth for most of her life. When complainant was eight years old, she accused her mother's boyfriend of sexually abusing her. The charges against mother's boyfriend were dropped before complainant turned nine, and when complainant was ten she made simular accusations against Appellant of sexually abusing her when she was nine and 10. Complainant explained in detail that she falsely accused her mother's boyfriend at Appellant's behest. During an interview with a detective, Appellant explained that there was a parental purpose, and he denied committing or acting with sexual intent with respect to the other alleged acts. Appellant argued that complainant was not credible, since her cliams could not fairly be characterized as consistent. Appellant presents a detailed recitation of the facts under Points of error one threw Four, where he challenges the sufficiency of the evidence, and claims his trial counsel was ineffective.

## SUMMARY OF ARGUMENT

Appellant who was complainant's father, was charged with four counts of sexually abusing her. The evidence was insufficient to prove any of the counts under a rigorous assessment of the qualitative value of the evidence. One important consideration was that complainant falsely accused her step-father of simular sexually abuse two years earlier. On another accusation complainant accused live-in boyfriend of simular abuse. Complainant is a slow learner and is in special education at her school. Should this Court not reverse and render judgment of acquittal with respect to some or all of the counts for insufficient of the evidence, it should reverse and remand on any counts where it determines that Appellant was **(deprived of his right to counsel under the 6th Amendment to the U.S Constitution). There various factors that require a determination of Objectively unreasonable conduct, and such deficiencies undermined confidence in the out-come of the trial proceedings as hole, if prejudice should not be presumed due trial counsel's hearing impairment, and the fact this Appellant is mentally retarded. Appellant asserts he told his trial counsel he could not read and write and did not understand what was going on during important parts of the trial proceedings. The factor in question include but are not limited to; trial counsel sufferedhearing impairment which, among other things, caused him to elicit evidence that Appellant attempted to intimidate complainant shortly before trial, and he failed to call available witnesses to show that her testimony was incorrect in pertinent part: (complainant stated at trial ther was white stuff on the inside of her legs, but during her forensic interview she did not mention that important fact). Trial counsel failed to use complaintant's video-taped recantation; he failed to use complainant's forensic interview to demonstrate the validity of Appellant's defense and to establish substantial questions concerning complainant's credibility; and he failed to call complainant's step-mother (Jenifer White) to contradict key assertions that complainant made.

## RELATIONSHIP AND CHRONOLOGY

Complainant was Appellant's daughter and her mother was Lavondra Draper. At the time of Appellant's trial in April of 2013, Appellant was 29 years old, Draper was 27, and complainant, who was born in 2000, was 13. Appellant and Draper never married, as the State pointed out in its opening statement. Appellant and Draper conceived complainant when Draper was 13 years old. (Jenifer White is Appellant's grilfrind).

4.

Complainant lived with Appellant until 2008, when she and her younger sister, Ashanti, went to live with Draper, who was living with her boyfriend, Ronnie Randles, and with thir daughter, Jae'niya. Appellant re-assumed custody of complainant and Ashanti after complainant accused Randles of sexually abusing her. The charges against Randles were dismissed in September of 2008. (RR5: 112-13, 116-18, 121, 124).

In the spring of 2010, complainant alleged that Appellant penetrated her sexual organ with his penis and during a December 2010 investigation of physical abuse against complianant by Draper's new live-in boyfriend, Demarcus Carter, complainant said that Appellant's abuse against her included digital penetration. During complainant's teatimony at Appellant's trial, complainant told the jury that Appellant also sexually abused her in ways that did not included penetration. (RR4: 51-53).

## Evidence in Detail

Complainant accused her mother's boyfriend of sexually abuse in 2008, but the charges were dismissed.

Kim D'Avignon was a Tarrant County prosecutor who was assigned to prosecute Ronnie Randles,Draper's live-in boyfriend, for sexually abusing complainant in 2008. (RR5: 111, 123). Based on testimony from a Child Protective Services investigator, there was a 95 percent chance that the allegations were true, since Child Protective Service evidently would have found that there was reason to believe complainant; was forensically interviewed by Lindsey Dula, who had done over 6,000 interviews, *including the forensic interview of this Appellant who was convicted of the same accusations conducted by the same Child Protective Service Lindsey Dula. Lindsey Dula should have excused her self from the case at Bar in regards to conflict of interest issues.

Kim D'Avignon decided to dismiss the charges against Randles, considering three factor: 1) complainant was not credible, 2) Appellant did not respon to messages, which was not how a victim's parent normally acted, and 3)Randles was going to be incarcerated pursuant to a plea bargain for a bueglary offense. (RR5: 112-13, 116-18, 121-125).

Complainant is a slow learner and is easily mislead into beliving what someone coaches her to say as was done in the forensic interview conducted by Child Protective Service Lindsey Dula who had already done an forensic interview in the (Ronnie Randles Case, * which was a conflict of interest due the fact "Dula" testified against Appellant of the same abuse just afew year before conducting simular forensic interview against Appellant Case at bar.

*Draper took complainant to the hospital, where they said nothing was wrong with complainant, except she had some white stuff on her, as complainant told the jury. (RR4: 46--48). During complainant's forensic interview she did not mention this speific detail concerning white stuff found on her, as complainant explained during her testimony to the jury.

Appellant explained to Detective Henz that Appellant checked complainant after her five year old brother said that complainant made him put his no-no inside of her. (RR4: 92-93, 101; SX-2: 12:41:00).

Detective Henz told the jury that he reviewed the videotape of complainant's forensic interview, which was not shown to the jury, but he omitted that complainant went into detail about the day when Jennifer White found complainant acting out with Appellant's five-year-old son, Ausbon Jr, which precipitated complainant being confronted and checked by Appellant. (RR5: 95, 101; RR7: 8-9; DX-3: 21-25, 34, 41-42; DX-4). Jennifer white is Appellant's mother with son Ausbon Jr., and was present when Appellant check complainant. It can be said beyond a resaonable fact that Appellant had a parental purposes in checking his daughter after learning these very important facts concerning his daughter and son.

## STANDARD OF REVIEW

In review the sufficiency of the evidence, this Court considers all of the evidence in the lightmost favorable to the verdict to determine whether any rational trier of fact relying on the evidence and reasonable inferences to be drawn from the evidence could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia 443 U.S. 307, 318-19 (1979); Brooks v. State, 323 S.W.3d 893, 894 (Tex Crim App. 2010). Under Brooks, this Court should conduct a rigorous legal sufficiency review that focuses on the quality of the evidence that was presented. Brooks, 323 S.W3d at 917-18 (Cochran J., concurring). While this Court should give deference to the responsibility of the jury to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, this Court should remain mindful that legal sufficiency is judged by the quality of the evidence and by the level of certainity that the evidence engenders in the fact finder's mind. Brooks, 323 S.W.3d at 915 (Cochran, J., concurring); see Hooper v. State, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007), citing Jackson, 443 U.S. at 318-19.

Under Malik v. State, this Court measures the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case. Malik v. State, 953 S.W.2d 234 (Tex. Crim. Aoo. 1997). A hypothetically correct charge is one that accuately sets out the law, is authorized by the indictment, does not unnecessarily increase the Stat's burden of proof or unnecessarily restrict the State's theories of liability, adequately describes the particular offense for which the defendant was tried, and takes into account other relevant factors. Such a standard ensures thata judgment of acquittal is rendered when there is an actual failure in the State's proof of the crime rather that a mere error in the jury charge submitted.
In Appellant's case, the State alleged that Appellant acted knowingly and intentionally, even though the offense can be committed by mere reckless conduct. See Tex. Penal Code 2204(f) (providing that injury to a child is a state jail offense if committed recklessly and is a thrid degree offense if committed intentionally or knowingly). While the evidence indicated that Appellant might have acted recklessly with respect to the result in putting his finger inside of complainant, especially when he had fingernails that might scratch her, the quality of the evidence was insufficient to engender a level of certainty that Appellant had any intent in cause bodily injury.

6

In Appellant's case, the State alleged that Appellant acted knowingly and intentionally, even though the offense can be committed by mere reckless conduct.

The evidence was insufficient to support the conviction for digital penetration because there was no rational basis for concluding that Appellant inserted his finger.

A person commits aggravated sexual assault of a child if he intentionally or knowingly digitally penetrates the sexual organ of a child younger than fourteen years of age. Tex. Penal Code 22.021(a)(1)(B)(i). According to Count One, Appellant inserted his finger into complainant's female sexual organ on or about July 29, 2009. Appellant recognizes that credibilty choices and inferences generally reside within the realm of juror discretion, but Appellant respectfully submits that the evidence, when judged according to its qualitative factors, was insufficient to support a rational conclusion that he inserted his finger into complaint's sexual organ. Brooks, 323 S.W.3d at 915 (Cochran, J., concurring). Complainant told the jury there were only two instantances of penetration: penile-vaginal penetration on the Chuck E. Cheese day in Fort Worth and digital penetration when she lived with Appellant in Arlington. Complainant told Kynnisha Warren, that Appellant used his penis. Complainant told CPS Investigator Henderson that Appellant only used his finger. Complainant told the forensic interviewer, Lindsey Dula, that the Chuck E. Cheese day involved penile penetration. Complainant focused on digital penetration on the Chuck E. Cheese day in talking with SANE; complainant confirmed penile penetration without eleborating.

Moreover, there were also questions about complainant's general truthfulness, considering her admittedly false accusations against Ronnie Randles case. Even if the accusations against Randles were true, the Randles factor favored Appellant. Considering that complainant's claims against Randles survived the 95 percent-certain screening process, the rational conclusion was that they were true.(See factual background)

The evidence was insufficient to support the conviction for digital penetration because Appellant had a parental purpose.

Assuming that the evidence were sufficient to establish that Appellant inserted his finger, Detective Henz' testimony still indicated that Appellant admitted the conduct, which did not involve his sexual organ or mouth, and stated that he acted with "parental intent". Under those circumstances, Appellant was qualified for a medical care defense instruction. Tex. Penal Code 22.011(d); 22.021(d); Cornet v. State, 359 S.W.3d 217, 222 (Tex.Crim.App. 2012). In Cornet, the Court of Criminal Appeals held that the trial court erred in refusing a medical care instruction, even though the parent-defendant did not have medical training, when the parent-defendant indicated suspicion of sexual abuse. Appellant indicated a medical purpose; he was concerned that complainant might even need a shot if she were pregnant. (RR4: 93; SX-2: 12:41:00). This Court should find that evidence was insufficient to show digital penetration, even though Appellant did not request the instruction, because a hypothetically correct jury charge would have included the instruction, and a rational jury would have found that Appellant did not act with a medical purpose. Malik, 953 S.W.2d at 240 & 240 n. 5. The Appellant is considered to be a Mentally Retarded Offender and could not possibly known what a medical care instruction meant in legal terms.

7

Under the unique circumstances in Appellant's case, the evidence was insufficient to show that Appellant was not acting with parental intent, as Appellant explained. Jackson, 443 U.S. at 318-19.  To be sure, as demonstrated Appellant would have qualified for a medical care defense instruction in the context of an allegation of digital penetration. Pursuant to its rigorous qualitative evaluation of the record, this Court should conclude that a rational jury could not have concluded that Appellant acted with intent to arouse and gratify his sexual desire. Brooks 323 S.W.3d at 915.

Appellant adopts discussion from pertinent respect in lieu of unnecessary repetition, Appellant specifically submits the comparison of complainant's testimony about the alleged specific acts with her statements to the State witnesses, including to the forensic examiner. (APX) L. Dula. Appellant futher again submits his discussion concerning the general concerns about complainant's truthfulness.  Thus, when judged according to its qualitative  factors, the evidence was insufficient to support a rational conclusion, Appellant acted with sexual desire to gratify his sexual desire.

## APPELLANT WAS DEPRIVED OF HIS SIX AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WITH RESPECT TO HIS TRIAL ON GUILTY OR INNOCENCE AS TO AGGRAVATED SEXUAL ASSAULT BY DIGITAL PENETRATION ALLEGED IN COUNT ONE THRU FOUR

Appellant demonstrates in Points of Error One-Four that he was deprived of the effective assisance of counsel in connection with his defense on each count as to guilty or innocence.  Appellant discusses Points of Error One-Four togather, since they involve a common nexus of fact and law.

ADDITIONALFFACTS
## ADDITIONAL FACTS

Trial counsel had congestion in his Eustachian tubes during trial, which caused him to experiece hearing problems. (RR3: 98, 104, 123, 125, 127, 129; RR4: 13-15, 39, 52, 56, 62, 64, 67, 71, 101, 104, 121, 126; RR5: 20-21, 43, 57, 59-60, 90, 96, 98, 121, 135, 137-38; RR6: 14,20, 23-24, 41, 44, 52, 57; RR7: 9, 13-15, 18-19, 31, 36-37, 39, 46, 48).  Trial counsel believed that his poor hearing "probably" affected his performance.(RR7: 13-14).

The record demonstrates:

* Trial counsel had trouble hearing prospective jurors, and he required clarifications from the trial court in exercising his strikes. (RR4: 13-14, 39,47, 50, 52, 64-65, 68-70; RR5: 131; RR7: 13-14).

* Trial counselhad substantial difficulty in hearing the testimony; he "wasn't really sure that I knew exactly what [witness] were saying," even after they repeated their responses to his questions ions.  (RR4: 13-14, 39, 47, 50, 52, 64-65, 68-70; RR5: 131; RR7: 13-14).

8

ADDITITIONAL FACTS

* Trial counsel spent much of his cross-examination time simply confirming testimony given by the State's witnesses.  The problem was evident during his cross-examination of the Sexual Assault Nurse Examiner and of the CPS investigator, Jerald Henderson and Brittney Payton.  (RR4: 120-26; RR5: 19-21, 57-60).

* Trial counsel evidently did not hear Detective Henz mention Appellant's explaination that complainant was acting-out, which Detective Henz considered to be questionable.  Trial counsel did not clarify that complainant went into detail during her forensic interview, about her acting-out with Appellant's five- year-old son.  Trial counsel did not challenge Dective Henz' suggestion about the absence of support for Appellant's explaination as misleading, since Dective Henz reviewed the forensic videotape.  (RR4: 106; RR5: 95, 101; RR7: 8-9; DX-3: 21-25, 34, 41-42; DX-4; APX48).

* Trial counsel had trouble hearing "anything" that the soft-spoken complaonant said; for example, he misunderstood complainant to say that she did not make allegations against Roonie Randles. (RR4: 13-14, 39, 47, 50, 56; RR5: 131).

* Trial counsel's inability to hearing complainant evidently contributed to his unintentional elicitation of testimony from complainant that Appellant went to look for her at her school during the week or two before trial, i.e., that Appellant was attempting to intimidate her or to otherwise influence her testimony. (RR4: 39, 52, 64-65, 68-70).  Trial counsel testifed at the motion for new trial hearing that he asked about Appellant going to complainant's school in order to prevent the State from asking the question, but the record shows that the State had already completed its direct examination.  (RR4: 59, 65-68; RR7: 25).

* Trial counsel did not offer available testimony from the cousins to demonstrate the falsity of complainant's testimony about seeing Appellant at her school. (CR: 676-80; RR7: 8;)

* Trial counsel had substantial trouble understanding the names of complainant's cousin-schoolmates during complainant's testimony even though trial counsel used their names, but not not his hearing troubles, in support of a continuance motion that he filed the week before.  (CR: 543-44; RR4: 71).

* Trial counsel's inability to hear might have been related to his not challenging the testimony that a finding of reason to believe CPS means that the investigator is 95 percent sure.  (RR7: 15-17). If counsel had objected, he would have urged that the testimony was overly prejudice.  (RR7: 17).

His hearing impairment aside, trial counsel was hesitant to use her statements from her forensic interview, even though trial counsel believed that her testimony was "not the same." (RR7:22).  Trial counsel did not want to use complainant's inconsistent statements to support his theory, or to impeach her, for fear of "badgering." (RR7: 22-23).

9

## ADDITITIONAL FACTS

Trial counsel chose not to use complainant's interview to illustrate:

* Trial counsel did not recall if complainant mentioned in her for-
  ensic interview that Appellant manipulated her into acSing Randles.
  The videotape demonstrated that complainant did not unambiguously
  disavow her allegations against Randles.  At a certain point, com-
  plainant confirmed that Randles put his stuff in her, and she said
  that complainant's mother caught him.  Trial counsel did not beli-
  eve that there was value in showing that complainant was truthful
  with respect to Randles, since showing that Appellant did not co-
  ach complaiant "does not mean that it did'nt happen" with Appellant
  (RR7: 28-29; APX 9¶ ).

* Dective Henz was incorrect that Appellant lacked support for his
  parenting theory, since complainant discussed her acting-out ep-
  isode in detail.  APX 4¶8).

* Complainant made various statements that would have been contrad-
  icted by Jennifer White:  Complainant did not report abuse to
  Jennifer; Jennifer did not see Appellant penetrate complainant
  with his penis; and Jennifer and others saw or were present when
  complainant checked complainant by looking at her only.  (RR7:8;
  RR8: DX-2)

---

Trial counsel also cross-examined Dula about Dula's 2008 interview with
complainant regarding Ronnie Randles.  (RR3: 103).  Dula conceded that
complainant alleged penile-vaginal penetration with respect to Randles,
the same as complainant alleged with respect to Appellant.  (RR5: 105).
Dula also conceded that complainant was very detail-oriented concerning
the sensory and peripheral details involving the Randles abuse, and Dula
agreed that a child that was coached would not be able to provide sen-
sory and peripheral detail.  (RR5: 86, 105-07).

* Trial counsel did not have Draper interviewed to determine if she,
  like Jennifer, would have denied complainant was really telling
  the truth. (APX 9¶12-13).  Complainant never complied with Dula's
  request for her to explain whether Appellant came downstairs na-
  ked as the only time when Appellant put his privacy inside com-
  plainant or whether it was Jennifer walked in. APX 9¶ 13).  Dula's
  testimony that complainant was "very consistent" was leading. (RR5
  81-83, 89).

* The two instances of abuse that complainant decribed contradicted
  her testimony.  During her forensic interview, complainant told
  Dula, the interviewer, that Appellant put his privacy part into
  complainant to "check" her in the living roon in the house in Fo-
  rt Worth in 2009, which was witnessed by Jennifer White, and she
  said that Appellant put his finger inside of her in 2010 in the
  living room in the Fort Worth house before they went to a party
  at Chuck E. Cheese (RR5: 80-87; APX 9¶ 3-4, 6-13). Complainant
  told the jury that the abusive acts were penile-vaginal penetrat-
  ion on the Chuck E. Cheese day and penile penetration at their
  house in Arlington in 2009.  (RR4: 26-50).

### Additional Facts

* Complainant's testimony at trial about "white stuff" was new; she did not mention anything about white stuff in her forensic interview, much less in her statements to any of the State witnesses. Trial counsel decided not to address the inconsistency, because it was too graphic. (APX; RR4: 46; RR7: 31; APX).

Counsel did not recall the specific reasoning for not having Jennifer White testify that she did not see Appellant penetrating complainant with with his penis, as complainant alleged , but counsel chose not to call Jennifer, because he decided, after discussing it with Appellant, that it would have been counterproductive. (RR7: 25-26, 44-45).

Instead, trial counsel conducted a limited cross-examination of complainant, which brought out all the inconsistencies that he could think of without appearing to be badgering. (RR7: 22-23). Counsel believed that asking too many specifics might be a misplaced approach, since complainant did not appear to understand specifics very well. (RR7: 24). Counsel obtained an addmission from complainant that complainant was untruthful in a conversation with her Aunt Lamesha when complainant denied that Appellant had been to her school; complainant said it was okay to lie sometimes, if need be. (RR4: 73). Complainant also testified that she never told lies, except she agreed that she got into trouble for telling the police that Randles touched her, since he was in jail at the time. RR4: 60). Complainant denied that she changed her story on February 6, 2012 to say that Appellant only checked her with his finger, and that he only did it once. (RR4: 63, 65-67). Complainant reiterated that her testimony was that Appellant touched her with "[h]is privat part and his hand." (RR4:63).

Trial counsel also cited badgering-type concerns in explaining his reasons for not using a videotape taken in a school cafeteria in 2010 or 2011 wherein complainant recanted all of her allegations against Appellant. (RR7: 7; 10; RR8: DX-2: Attachments 1-2, 9). Trial counsel was concerned that use of the cafeteria video might have been counterproductive. Trial counsel did not make a final decision not to the video until trial. Trial counsel did not bring the videotape to trial, but he denied the suggestion that he could have used it if he wanted to. (RR7: 10, 43; RR8: DX-2 Attachment 2: 6-7 Attachment #: 5-6). The Cafeteria Video would have shown complainant answering questions in part as follows:

Q. ...But like I was saying your - your daddy said he missed y'all, and so I told - you - what you was telling me that - did you - did you say he did anything?

A. No.

Q. He didn't do nothing to you?

A. Huh-uh.

Q. Promise?

A. I promise.

Q. Oh, okay.  So he didn't - oh, me and my mouth.  Get close so I can
whisper to you.  So he - so he didn't touch you or nothing?

A. (Moving head side to side.)

Q. Huh?

A. (Moving head side to side.)

Q. Oh, okay.  So why do people say that ?  They just probably trying to
make you not be with your family.

A. I don't know.  Now, a lady had asked me - she had ask me what my
daddy did "cause she didn't know about him.

Q. Uh-huh.

A. But that lady was just - that lady was just asking me something -

Q. Uh-huh.

A. --and I was lik, no, (inaudible).  And then that's when we had to
leave and I had to go back to the boy's dress club. And then -

Q. But you didn't tell her that he -

A.  Huh-uh.

Q.  Oh. Okay. "Cause I"m like why would he do that and -

A.  (Shrugging shoulders).

Q.  That's crazy.  They just - and I"m like he - I"m like he - they've
been staying with their daddy forever.  When your mamma was over the
road, I mean, y'all was staying with y'all daddy, right?

A. (Moving head up and down).

Q. Yeah. So your daddy didn't touch you nowhere?

A. (Moving head side to side).

RR8: DX-2: Attachment 1).

    Trial counsel testified that he did not object to the State using
various hearsay under the outcry exception to hearsay because he would
only object in front of the jury when he really needed to, although he
did not recall making a specific decision not to object about overuse
of the outcry exception. (RR7: 17-20).

12

The jury charge does not include any medical defense instructions, although in his closing argument, trial counsel urged that Appellant made a parenting decision when he looked at complainant's sexual organ. (CR: 588-604; RR5: 129, 140). Trial counsel urged that complainant was not credible because the suspiciousness of complainant using language about "rape" in her outcry to her teacher, the falsity of the claim that complainant made against Randles, and her use of falsity in avoiding a discussion with family members about Appellant going to complainant's school. (RR5: 135-41). Trial counsel told the jury that he was "not going to try to convince you of the many things that I've seen that are inconsistent.' (RR5: 140). Trial counsel's intent in final argument would have been to show inconsistency in the allegations and bring out the evidence that best favored Appellant. (RR7: 32).

## STANDARD OF REVIEW

## INEFFECTIVE ASSISTANCE OF COUNSEL

This Court reviews a challenge to the denial of Appellant's motion for new trial based on effective assistance under an abuse of discretion standard, reversing "only if the trial judge's opinon was clearly erronous and arbitrary." Riley v. State, 378 S.W.3d 453,457 (Tex.Crim.App. 2012). This Court views the evidence in the light most favorable to the trial court's ruling; it must not substitute its judgment for that of the trial court; and it must uphold the ruling if it was within the zone of reasonable disagreement. Wead v. State, 129 S.W.3d 126, 129 (Tex.Crim. App. 2004). If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. Riley, 378 S.W.3d at 457. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support its ruling. Webbv. State, 232 S.W.3d 109, 112 (Tex.Crim.App. 2007).

In applying the abuse of discretion standard, this Court should remain mindful that the focus of Appellate review of an effective assistance claim is the objective reasonableness of counsel's actual conduct in light of the evidence of the entire record. Andrews v. State 159 S.W.3d 98, 101 (Tex.Crim.App. 2005). When no reasonable trial stategy could justify his conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law. Lopez v. State, 343 S.W. 3d 137, 143 (Tex.Crim.App. 2011);Andrews, 159 S.W.3d at 102.

## EVALUATING INEFFECTIVE ASSISTANCE

To prevail on a claim of ineffective assistance of counsel, an Appellant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's unprofessional error, there is a reasonable prebability that the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668,669, 104 S. Ct. 2052, 2055-56, 80 L. Ed. 2d 674 (1984); Mitchell v. State 68 S.W.3d 640, 642 (Tex.Crim.App. 2002). A defendant has the burden to establish both prongs by a preponderance of the evidence; failure to make a showing under either prong defeats a claim for ineffective assistance. Mitchell, 68 S.W.3d at 642.

suffered hearing impairment,

Trial counsel had a duty to effectuate Appellant's rights to counsel and to have effective assistance of counsel. Trial counsel needed to hear the statements of the court, the State , the prospective jurors and the witnesses in order to function as counsel within the meaning of the Sixth Amendment. Burdine, 262 F.3d at 349 (holding that trial counsel's postpradial naps did not undermine the right to counsel because there was a second-chair defense attorney). It would have been an abuse of discretion for the trial court to deny a proper continuance motion demonstrating sufficient cause. In Appellant's case there was no reasonable strategic basis in trial counsel deciding not to seek a continuance based on his hearing impairment. Considering the entirety of the circumstances, counsel's performance in failing to seek a continuance fell below an objective standard of reasonableness as a matter of law. see Aldrich v. State, 296 S.W.3d 225, 245, 249 (Tex.App.). Since trial counsel objectively unreasonable determination to forgo a continuance request directly undermined Appellant's right to counsel, the result of the proceeding cannot be credited as reliable, and this Court should presume that the error affected the outcome, in satisfaction of the second prong of Strickland. Strickland, 466 U.S. at 692; Cronic, 466 U.S. at 654. Burdine, 262 F.3d at 349. As noted in Burdine, a lawyer who cannot listen cannot represent. Burdine 262 F.3d at 349. Moreover, ther would be harm from denial of the continuance motion, and the Strickland prejudice prong would be satisfied, since the record reflects an abundance where trial counsel's hearing affected the representation to the extent that confidence in the outcome is undermined due to the heightened probability of a different outcome.

failed to use complainat's videotaped recantation,

Trial counsel may make strategic decisions as to whether and how to cross-examine witnesses, and it is valid to take concerns into account about alienating the jury. Coble v. State, 501 S.W. .2d 344, 346. Complainant should have been impeached with her recantation in Appellant's case under a senario that was similar to the situation in Everage, 893 S.W.3d at 221-23. A trancript could have been prepared to make the impeachment efficient, and to mitigate counsel's concerns about alienating that jury, was objectively unreasonable considering the centrality of the recantation. The video and transcript of it also could have been used to confront the State witnesses for their incomplete and biased investigation. The video and transcript would have particularly supported a challenge the forensic interviewer's claims that she did not express substantial confusion during her interview of complainant. Since there was a substantial question about whether the jury would have acquitted if it knew about the recantation, which satisfied the second prong of Strickland.

failed to use complainant's forensic interview to demonstrate the validity of complainant's concerns about complainant acting out,

Yet it was true that there was a problem with complainant acting-out with Appellant's son, which lead to Appellant examining complainant, as complainant explained in detail during her forensic interview.

*14*

## INEFFECTIVE OF COUNSEL
### (continued)

## STANDARD OF REVIEW

FAILED TO USE COMPLAINANT"S forensic interview to better impeach complainant,

Similarly, it was not objectively reasonable for counsel not to specifically confront complaiant about the basic differences between her testimony and her statements during the forensic interview.

failed to use complainant's forensic interview to better impeac the forensic examiner,

As already noted, complainant explainations were so confusing and suspicious that the forensic interviewer, Dula, twice asked whether the claimed abused "really did happen," yet Dula told the jury that she perceived that complainant's statements were consistent.

Allowed the State to abuse the outcry exception,

Jennifer White was the outcry witness with respect to the vaginal and penile penetration, according to complainant's statements during her forensic interview, and Jennifer was also involved in responding to the touching in the house in Arlington, according to complainant's testimony.

failed to obtain a medical defense instruction.

Appellant's theory was that he acted only to the extent of concern for complainant's well-being, which thus limited his viewing her sexual organ without any touching. Appellant was eligible for a medical defense instruction. Cornet, 359 S.W.3d at 222; Tex.Crim.App. 1999).

## CONCLUSION

Under a Strickland analysis considering all of the factors raised, this Court should determine that substandard conduct was rendered and that Appellant is entitled to reversal bacause prejudice is presumed and because there is reasonable probability that the outcome would have been different but for the unprefessional errors. The evidence against Appellant was weak to begin with, due to complainant's false allegations against Randles, and if her accusation against Randles were considered truthful, the State case might be even weaker, since Appellant would not have coered complainant under that scenario. Since the State's weak evidence would have been substantially weakened if trial counsel had rendered effective representation in the specified ways, this Court should conclude that Appellant has met both prongs of Strickland.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant prays that this Court will sustain Points of error in regards to One thru Four, reverse the conviction and render judgment of acquittal as the Court deem approperiate under these circumstance in Appellants arguments. Appellant further prays for this case to be remanded for a new trial. Appellant prays for any such relief he may be entitled. Respectfully submitted

15

8-26-15

Clerk; Mr. Acosta;

Enclosed is Appellants P.D.R. Appellant request if you could present his P.D.R. before the Honorable Court of Appeals-(Criminal) on his behalf. The Appellant thanks the Court for it's kind assistance.

Respectfully submitted

APPENDIX-ONE


BRIEF FOR APPELLANT


Ausbon Osborne v. State.




Summary of December 22, 2010 Forensic Interview
(OF Complainant)

## PRAYER FOR RELIEF

For the reasons stated above, it is respcetfully submitted that the Court of Criminal Appeals of Texass should grant this Petition for Discretionary Review.

Respectfully submitted,

AUSBON OSBORNE
T.D.C.J.#1853817
379 FM 2972 W
Rusk, Texas 75785

---

## EXHIBIT/APPENDIX

Brief for Appellant
Ausbon Osborne V. State, Appeal (CRiminal Court of Appeals)
Summary of December 22, 2010 Forensic interview

ATTACHED AS APPENDIX-ONE

---

## CERTIFICATE OF SERVICE

The undersigned Appellant hereby certifies that a true and correct copy of the foregoing Petition for Discretionary Review has been mailed U.S. mail, to the Office of the Criminal District Attorney for Tarrant, County, (Fort Worth TX)

_____ ,ON THE _27_ DAY OF _AUGUST_,

2015.                                    _8-27-15_
                                        (APPELLANT/DATE)

**Summary of December 22, 2010 Forensic Interview**

1.  At the beginning of complainant's hour-long December 22, 2010 forensic interview with Lindsey Dula, Complainant said that she remembered being interviewed at the Alliance for Children about her step-daddy sexually abusing her; it was "about another story, what happened," not about "this story." (DX-3: 1; DX-4). Towards the end of the December 22, 2010 interview, complainant stated that, when she was eight years old, her step-daddy "put his stuff – he put his stuff in me like my daddy got – he put his stuff up in me...like my daddy did and it hurt." (DX-3: 52-53; DX-4). Complainant also stated that her step-daddy was "just pretending like he was going to do me like that but he didn't do – he didn't put it in me and stuff," but she added that her mother, Lavondra Draper, "catched him. Then I had told her and she said, okay, I'm going to call the police. He was in jail for a long time and then he got out yesterday. (DX-3: 52-53; DX-4).

2.  At the beginning and end of complainant's interview with Dula on December 22, 2010, Dula confirmed that complainant understood that the interview that time would be about "daddy" and not about Ronnie Randles. (DX-3: 1, 5, 14, 52, 60; DX-4). Complainant also understood that there would be a audio-video recording to show "are we doing bad things or doing right things." (DX-3: 1, 5, 14; DX-4).

3.  When Dula asked complainant to talk about Appellant, complainant said that complainant went to a party at Chuck E. Cheese's that was for complainant's niece. (DX-3: 13, 44; DX-4). Appellant drove complainant and complainant's two younger sisters from Appellant's house to the party. (DX-3: 13; DX-4). The children were in the car ready to go, but Appellant called complainant back into his house. (DX-3: 13, 46; DX-4). When complainant went inside, Appellant told her to give him a kiss on his lips, which she did. (DX-3: 43-45). Appellant then asked her to go upstairs and find him a black shirt or another clean shirt. (DX-3: 13; DX-4). Complainant brought a black shirt downstairs to Appellant who was in the living room. (DX-3: 13, 20; DX-4). Appellant then told complainant to pull

her pants and panties down so he could "check" her. (DX-3: 13, 20, 44, 46-47; DX-4). Complainant was scared to pull her pants down, but she did when Appellant said that he was fixing to get an extension cord implying he would hit her with it. (DX-3: 47; DX-4). Complainant told Dula that Appellant "stuck his finger up me" when he "checked" her "privacy part," which she uses to pee not to poop. (DX-3: 13, 15-16, 44, 47; DX-4). Complainant told Appellant that it "hurt." (DX-3: 13; DX-4). Complainant told Dula that Appellant said that it hurt because complainant had "been doing something with a boy or something." (DX-3: 13; DX-4). Complainant told Dula that Appellant said that it would not hurt if she had not been doing anything with a boy. (DX-3: 13-14, 47; DX-4).

4. Complainant indicated that she told Jennifer White, her stepmother, that Appellant put his finger inside of complainant before he took her and her siblings to Chuck E. Cheese. (DX-3: 46-48, 47; DX-4). Complainant reported to Dula that complainant told Jennifer about the Chuck E. Cheese incident even though Appellant told her not to tell anybody, although complainant later clarified that Appellant "didn't tell me don't tell nobody." (DX-3: 48, 60; DX-4). Complainant told Dula that complainant told Jennifer about the Chuck E. Cheese incident on the same day when it happened, and complainant confirmed that Jennifer was the first person complainant told. (DX-3: 48, 51; DX-4). Complainant explained to Dula that Jennifer told Appellant what complainant said. (DX-3: 48; DX-4). Jennifer explained that it meant something if it did *not* hurt. (DX-3: 47; DX-4) (emphasis supplied).

5. In response to being confronted by Jennifer, Appellant went to Lavondra Draper's house to ask complainant why complainant lied about the Chuck E. Cheese day. (DX-3: 48, 51; DX-4). Draper said "that's why my kids don't like going with you," because you always doing something to them. (DX-3: 48-49, 51; DX-4).

6. Complainant told Dula that she was nine years old and in the fourth grade when Appellant checked her before they went to Chuck E. Cheese. (DX-3: 15-16, 18, 20, 23, 43, 49-50; DX-4). Appellant only checked her once when she was nine, which was on the day when they went to Chuck E. Cheese, but as complainant explained, the checking happened "all the time" after she was 10. (DX-3: 15-16, 18, 49; DX-4).

7. Complaint also said that the first time Appellant "checked" her was after Jennifer White went to a store. (DX-3: 15-16, 18, 20, 23; DC-4).

Complainant later said that the time when Jennifer went to the store was when complainant was ten. (DX-3: 41; DX-4).

8. Complainant was nine years old on the day when Jennifer went upstairs before Jennifer went to the store. (DX-3: 21-22; DX-4). Complainant was upstairs with her three younger siblings: an eight-year-old girl, a five-year-old boy and a one-year-old girl. (DX-3: 21-22; DX-4). The children were playing "babies," a game where complainant's siblings were her children. (DX-3: 21-22; DX-4). Jennifer "said we was doing something and then she checked him," i.e., complainant's younger brother. (DX-3: 21; DX-4). Jennifer "said his privacy was up – sticking up and – and then she said if it stick up, that mean you've been doing something with somebody." (DX-3: 21; DX-4). Complainant's little brother told Jennifer that complainant told him to do something to complainant; complainant explained to Dula that "we didn't do nothing, really." (DX-3: 22, 42; DX-4). When Jennifer went downstairs and informed Appellant about what complainant's brother said, Appellant told complainant's little brother to "tell the truth," but he "told a lie." (DX-3: 22-24, 41-42; DX-4). It was true, however, that a seven-year-old boy went to Appellant's backyard and showed pictures of naked girls to complainant. (DX-3: 55-56; DX-4).

9. After Jennifer left with complainant's siblings to go to the store, Appellant called complainant downstairs, and he asked complainant what complainant's eight-year-old sister would say about the statement that complainant's little brother made. (DX-3: 34; DX-4). Appellant told complainant to get the extension cord, as complainant explained to Dula, because Appellant was going to whoop complainant. (DX-3: 25, 42; DX-4). Instead, Appellant turned the TV off and "checked" complainant, (DX-3: 23-25; DX-4). Appellant checked her in the living room. (DX-3: 23-25; DX-4).

10. Complainant told Dula that a separate time was when Appellant first checked complainant; it was "in my sister's room," or rather when complainant was downstairs, but the TV was on, and complainant was watching the Disney Channel. (DX-3: 25-26, 35; DX-4). Complainant told Dula that Appellant went upstairs, took his clothes off, came back downstairs, and sat on a couch in the living room next to the couch where complainant was sitting. (DX-3: 27-28, 32-35; DX-4). Appellant told complainant to take her clothes off and lay down, as complainant explained. (DX-3: 28, 33; DX-4). Complainant told Dula "then he had checked me

77

again. He had put his – no, he – he had put his privacy part in me," which hurt. (DX-3: 29-30, 33-34; DX-4). Complainant apparently meant to clarify that Appellant did not check her on the first occasion when he sexually abused her; Appellant "just put his privacy in me." (DX-3: 31; DX-4).

11. According to complainant, Jennifer came in when Appellant put his privacy inside of her. Jennifer "screamed," demanding to know "why are you doing your child like that?" (DX-3: 30; DX-4). Jennifer saw "when he put his – when he almost put his privacy in" complainant, "but he really did. He said he almost did, but he did." (DX-3: 30; DX-4). Jennifer saw Appellant put his stuff inside of complainant, but nobody saw the time when Appellant was checking complainant, as complainant explained to Dula. (DX-3: 50-51; DX-4). Jennifer screamed "why are you doing that to your child," and Appellant told complainant to put her clothes on, because Jennifer was always calling the police on Appellant. (DX-3: 38, 40; DX-4). The police went to Jennifer's house, according to complainant's understanding from talking with Jennifer, but complainant did not talk with them, because complainant was at Appellant's house. (DX-3: 39-40; DX-4).

12. When Dula asked complainant to clarify where complainant was when Appellant put his privacy inside complainant, complainant said "[i]n my sister's room – no, in his room." (DX-3: 36; DX-4). Dula responded: *"I'm a little confused. Because just a minute ago you were telling me that he told you to take your clothes off and lay back on the couch...[s]o I'm – I'm confused. Is the stuff that you're telling me about your dad, is that stuff that really did happen that you remember in your own head?"* (DX-3: 36; DX-4) (emphasis added). Complainant replied that she did not remember where she was in Appellant house when he put his privacy inside her, because she was *confused* about whether she was nine or 10, but it "was probably upstairs or downstairs." (DX-3: 36-37; DX-4). When Dula asked again about the location, complainant said it was downstairs on the couch. (DX-3: 36-37; DX-4). After Appellant put his privacy in complainant's privacy, Appellant told complainant to get dressed, go upstairs to his room, and watch TV. (DX-3: 38; DX-4).

13. Dula was also *"a little confused"* about whether there was more then one time when Appellant put his privacy into complainant's privacy. (DX-3: 38; DX-4). Dula explained to complainant that complainant described an incident when Appellant came downstairs naked as the only time when Appellant put his privacy inside complainant, but complainant also said that

Jennifer walked in during the only time when Appellant put his privacy into her privacy, which was when complainant was nine years old. (DX-3: 37-38, 40; DX-4). Complainant did not explain; complainant instead further discussed the time when she was nine when Jennifer came into Appellant's house. (DX-3: 38-40; DX-4).

14. Complainant further discussed "all the time when I go to sleep with my little baby sister." (DX-3: 17; DX-4). Somebody always took her pants off. (DX-3: 18; DX-4). Complainant did not know who took her pants off, since a lot of people were in the house. (DX-3: 17; DX-4). Jennifer asked Appellant why complainant always said somebody took her pants off. (DX-3: 18; DX-4). According to complainant, Appellant said that he took her pants off because they were tight, but complainant thought they were comfortable. (DX-3: 18; DX-4).

15. Dula left the room towards the end of complainant's interview. (DX-3: 18; DX-4). When Dula returned, she asked complainant: *"everything you told me about what happened with your dad, are those things that are – are right, things that are true that really did happen?"* (DX-3: 60-61; DX-4). Complainant nodded. (DX-3: 61; DX-4).

16. Complainant also confirmed that Appellant never made complainant touch him on his private part and nobody ever touched complainant except for complainant's step-daddy and Appellant. (DX-3: 53-54; DX-4).

79



# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00156-CR

AUSBON OSBORNE, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1316584R, Honorable George W. Gallagher, Presiding

May 29, 2015

MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant Ausbon Osborne appeals from his conviction by jury of two counts of aggravated sexual assault of a child,[1] one count of indecency with a child,[2] and one count of injury to a child[3] and the resulting sentences of thirty-five years of imprisonment for the aggravated sexual assault convictions, twenty years for the indecency

---

[1] TEX. PENAL CODE ANN. § 22.021(a)(1)(B) (West 2013).

[2] Tex. Penal Code Ann. § 21.11(c) (West 2013).

[3] TEX. PENAL CODE ANN. § 22.04(a)(3), (f) (West 2013).

conviction, and ten years for the injury conviction.[4] He presents nine points of error. We will affirm.

## Background

After appellant plead not guilty to each of the four offenses set forth in the indictment, the case was tried to a jury. The indictment indicates each of the four offenses allegedly occurred around the same time. The complainant is one of appellant's several children. By the time of trial, the complainant was in the sixth grade. While she attended some special education classes, her testimony demonstrated no particular difficulty in communication.

The complainant testified that when she was in the fourth grade, she told her teacher appellant had "raped" her. The teacher testified that she asked the complainant what happened and the child gave more details, telling the teacher of an instance on which her father sexually assaulted her by penile penetration. Complainant repeated her statements in a generally consistent manner to others, including investigators with child protective services, a forensic interviewer and a sexual assault nurse examiner. Complainant testified at trial to the same incident. Complainant also testified at trial to other instances in which appellant put his finger inside her "private part."

Appellant did not testify at trial. A detective and two child protective services investigators[5] investigating complainant's allegations testified appellant admitted to

---

[4] The sentences run concurrently.

[5] During the course of the investigation into complainant's allegations against appellant, the first investigator retired and the second investigator continued the inquiry into these allegations. Both testified at trial.

2

some unusual conduct with complainant. A detective testified that during an interview with appellant, appellant denied touching the complainant's "private parts" but told him he had looked at the child's "opening"[6] to "check" her for sexual activity because he believed she was having sex with older boys and might be pregnant or in need of medical care or birth control. The investigators testified appellant made similar statements to them. The first investigator also testified appellant admitted he penetrated complainant while "checking" her but said he did so only to determine whether she was sexually active. The second investigator testified appellant denied digital penetration. A detective testified appellant also stated complainant was a liar.[7]

The jury found appellant guilty as charged for each offense and assessed punishment as noted. Appellant subsequently filed a motion for new trial alleging ineffective assistance of counsel. The trial court held a hearing on appellant's motion during which it heard the testimony of appellant's counsel and considered documentary evidence. The motion for new trial was overruled by operation of law. This appeal followed.

Analysis

Sufficiency of the Evidence

In appellant's first five points of error, he challenges the sufficiency of the evidence to support each of his convictions.

---

[6] The prosecutor clarified the "opening" of which appellant spoke was the complainant's vagina.

[7] Complainant made an allegation of sexual abuse against another male. During punishment, other witnesses, including the mother of some of appellant's other children, concurred that complainant frequently lied.

3

## Standard of Review

In reviewing issues of legal sufficiency, an appellate court views the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inference therefrom, a rational jury could have found each element of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010); *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003); *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) (*citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). If, given all of the evidence, a rational jury would necessarily entertain a reasonable doubt of the defendant's guilt, due process requires that we reverse and order a judgment of acquittal. *Swearingen*, 101 S.W.3d at 95 (*citing Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992)). We measure the sufficiency of the evidence against the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997).

## Aggravated Sexual Assault of a Child

By count one of the indictment, appellant was alleged to have, on or about the 29th day of July 2009, "intentionally or knowingly cause[d] the penetration of the female sexual organ of [complainant], a child younger than 14 years of age who was not the spouse of the defendant, by inserting his finger into her female sexual organ." Count two of the indictment alleged appellant, on or about the same date, "intentionally or knowingly cause[d] the penetration of the female sexual organ of [complainant], a child

4

younger than 14 years of age who was not the spouse of the defendant, by inserting his penis into her female sexual organ."

To prove aggravated sexual assault, the State must show (1) appellant intentionally or knowingly (2) caused the penetration of the anus or sexual organ of a child by any means and (3) the child was younger than fourteen years of age. TEX. PENAL CODE ANN. § 22.021 (West 2013). Under Texas law, the uncorroborated testimony of a child victim, standing alone, is sufficient to support a conviction for aggravated sexual assault under section 22.021. *Tran v. State,* 221 S.W.3d 79, 88 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *Jensen v. State,* 66 S.W.3d 528, 533-34 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). Because appellant does not contest the evidence of complainant's age, we address only the first two elements of the offense.

At trial, complainant testified to each of the elements of aggravated sexual assault as described in counts one and two. She testified that one day, as appellant was about to take some of the children to Chuck E. Cheese, appellant called complainant inside from the car to help him find a shirt. She found one and brought it to him. "He laid me on the couch, and I tried to get up off the couch so I couldn't, and that's when I started hollering, and that's when he pulled down my pants, and I tried to pull them back up, and I couldn't so I just left it alone. And he wrapped my leg up and he wrapped my arm up and he had pulled my panties down, and then he put his stuff at me."[8] She stated, "[h]e had sticked it in me, and he said if it hurt, that means you been

---

[8] At trial, the prosecutor clarified with complainant that by her use of the word "stuff" in this context, she was referring to appellant's penis.

5

doing something. And if it don't, you haven't. And I said it hurt, and he said, yeah, I've been doing something." The complainant also testified to another instance in which appellant placed his finger inside her "private part" to "check" her.

The detective and investigators testified to statements made to them by appellant that he "checked" complainant on a day before he took his children to Chuck E. Cheese. He also admitted to one investigator to "checking" the complainant on other occasions. The investigator testified appellant admitted to digital penetration of the complainant while "checking" her for sexual activity. The forensic interviewer testified the complainant told her appellant "checked" her by "put[ting] his privacy to her privacy" and by "putting his fingers in her privacy." The complainant's teacher testified the child told her that her daddy "raped" her.

Appellant argues the hypothetically correct jury charge in this case would include consideration of the medical-care defense, because he was "checking" complainant for suspected sexual activity and its consequences. The Texas Penal Code provides for a medical-care defense to charges of sexual assault and aggravated sexual assault. *See* TEX. PENAL CODE ANN. §§ 22.011(d); 22.021(d) (West 2013). "It is a defense to prosecution . . . that the conduct consisted of medical care for the child and did not include any contact between the anus or sexual organ of the child and the mouth, anus, or sexual organ of the actor or a third party." *Cornet v. State*, 417 S.W.3d 446, 447 (Tex. Crim. App. 2013).

*Malik* provides that a hypothetically correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's

6

theories of liability, and adequately describes the particular offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240. As to defenses, a hypothetically correct jury charge does not include any and all potential defensive issues but only those applicable to the case. *See Cornet v. State*, 359 S.W.3d 217, 228 (Tex. Crim. App. 2012) (trial court erred by refusing medical care defensive instruction). A "defensive issue" is not "applicable to the case" unless the defendant timely requests the issue or objects to the omission of the issue in the jury charge. *Tolbert v. State*, 306 S.W.3d 776, 780 (Tex. Crim. App. 2010). And, the question whether to include a defensive issue is a strategic decision "generally left to the lawyer and the client." *Golston v. State*, No. 06-11-00136-CR, 2012 Tex. App. LEXIS 5251, at * 21 (Tex. App.—Texarkana June 29, 2012, pet. ref'd) (mem. op., not designated for publication) (*quoting Posey v. State*, 966 S.W.2d 57, 63 (Tex. Crim. App. 1998)). Appellant did not ask for its inclusion and therefore, the medical-care affirmative defense is not to be considered here in the evaluation of the sufficiency of the evidence to support appellant's convictions for aggravated sexual assault of a child.

There is no requirement that physical, medical or other evidence be proffered to corroborate the complainant's testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (West 2011); *Wallace v. State*, No. 07-09-00099-CR, 2011 Tex. App. LEXIS 1384 (Tex. App.—Amarillo Feb. 23, 2011, no pet.) (mem. op., not designated for publication) (*citing Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978) (concluding that victim's testimony alone is sufficient evidence of penetration in prosecution for aggravated rape, without medical, physical, or other evidence)). We find the evidence sufficient to support

appellant's convictions under counts one and two of the indictment for aggravated sexual assault of a child. We overrule appellant's second, third and fifth points of error.

Indecency With a Child

To prove indecency with a child as alleged in count three of the indictment, the State was required to prove appellant, with a child younger than 17 years of age, whether of the same or opposite sex, engaged in sexual contact. TEX. PENAL CODE ANN. § 21.11(a) (West 2013). "Sexual contact" includes, if committed with the intent to arouse or gratify the sexual desire of any person, any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child. TEX. PENAL CODE ANN. § 21.11(c) (West 2013).

Appellant argues the evidence was insufficient to show he acted with the requisite *mens rea* because he was engaging in a parental purpose by "checking" complainant. Intent to arouse or gratify can be inferred from conduct, remarks and surrounding circumstances. *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd). The jury was free to believe or disbelieve any portion of the testimony and, as evinced by the verdicts here, chose to believe the version of the events expressed by complainant at trial. *Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997); *see Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (the trier of fact may believe witness even though his testimony is contradicted).

The complainant testified appellant touched her genitals with his finger. An investigator testified appellant acknowledged at one point that he did penetrate the complainant's genitals. The jury had before it also testimony from the detective and two

8

investigators that appellant said he "checked" the complainant to see if she was sexually active. Appellant argues these statements show he did not engage in sexual contact with the complainant to arouse or gratify his sexual desire but rather had a parental purpose for doing so. But, the jury also had before it the complainant's testimony that appellant had previously penetrated her with his penis for the ostensible purpose of "checking" her for sexual activity. If the jury believed this testimony and did not believe the penile penetration was for a parental purpose, it was free to infer appellant engaged in the other acts of penetration for the purpose of arousing or gratifying his sexual desire. *See, e.g., Abbott v. State*, 196 S.W.3d 334, 341 (Tex. App.—Waco 2006, pet. ref'd) (jury can infer intent to arouse or gratify sexual desire from defendant's act of touching child's genitals and commission of same conduct on other occasions is additional evidence of that intent). The jury did not have to believe appellant's parental purpose explanation and could have convicted appellant based on the testimony of the complainant and other witnesses. *Sharp*, 707 S.W.2d at 614. The evidence was sufficient to support appellant's conviction for indecency with a child and we overrule appellant's fourth point of error.

Injury to a Child

A person commits the offense of injury to a child if he, by act, intentionally, knowingly, recklessly, or with criminal negligence causes bodily injury to a child under the age of fourteen. TEX. PENAL CODE ANN. § 22.04(a)(3) (West 2013). "Bodily injury" means physical pain, illness, or any impairment of physical condition. TEX. PENAL CODE ANN. § 1.07(8) (West 2013). Injury to a child is a result-oriented offense requiring a mental state that relates not to the charged conduct but rather to the result of the

9

conduct. *Baldwin v. State,* 264 S.W.3d 237, 242 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).

Count four of the indictment in this case alleged appellant committed the injury to complainant intentionally or knowingly. Appellant challenges only the evidence supporting his intent or knowledge of causing bodily injury. He argues that "[i]n a rational sense, the evidence at most demonstrated negligence or recklessness with respect to the possibility of bodily injury," not intent or knowledge as to causing bodily injury. He asserts the evidence could not have shown he acted with intent or knowledge because he was conducting this action with the parental purpose of "checking" complainant for sexual activity with boys.

Complainant testified at trial that appellant penetrated her "private part" with his finger and that it hurt because of his "long nails" and that "his bone hurt." The sexual assault nurse examiner testified that touching a young girl's hymen is painful for the girl. Complainant testified appellant had previously used his penis to penetrate her and told her that if it hurt, this meant she was sexually active. The forensic investigator testified complainant made those same statements to her. Thus, if believed by the jury, the jury heard from complainant that appellant at least knew penetration of the complainant's female sexual organ by his penis caused injury to her. The jury heard testimony that appellant made statements that he was "checking" the complainant and, if they believed he penetrated her with his finger on any of those occasions, the jury could have inferred he did so with the intent or knowledge that he would injure the complainant because he knew penetration injured her. The jury was free to infer from this testimony that

10

appellant acted with more than recklessness or negligence when he penetrated complainant's sexual organ with his finger. *Sharp,* 707 S.W.2d at 614.

From this evidence, the jury could have reasonably concluded appellant intentionally or knowingly inflicted bodily injury on the complainant. We resolve appellant's first point of error against him.

Ineffective Assistance of Counsel

In appellant's remaining four points of error, he contends he received ineffective assistance of counsel during the guilt-innocence phase of his trial and the trial court erred in allowing his motion for new trial regarding his counsel's assistance to be overruled by operation of law.

We defer to the trial court's right to weigh the credibility of the testimony at the hearing on the motion for new trial. *See Salazar v. State,* 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). "Because the trial judge is the sole judge of the credibility of the witnesses, a trial court does not abuse its discretion by denying a motion for new trial based on conflicting evidence." *Cueva v. State,* 339 S.W.3d 839, 857 (Tex. App.— Corpus Christi 2011, pet. ref'd). In assessing the evidence presented at the new trial hearing, the trial court, sitting as the trier of fact, may also consider the interest and bias of any witness. *Messer v. State,* 757 S.W.2d 820, 828 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (per curiam) (*citing Costello v. State,* 98 Tex. Crim. 406, 266 S.W. 158 (Tex. Crim. App. 1924)). Deference to the trial court is required even if we would weigh the testimony differently than did the trial court. *Salazar,* 38 S.W.3d at 148. Thus, we review the evidence in the light most favorable to the trial court's ruling and presume all

11

reasonable findings that could have been made against the losing party were so made. *Alexander v. State*, 282 S.W.3d 701, 706 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd); *Acosta v. State,* 160 S.W.3d 204, 210 (Tex. App.—Fort Worth 2005, no pet.). Only when no reasonable view of the record could support the trial court's ruling do we conclude the trial court abused its discretion by denying the motion for new trial. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006).

The trial court's determination of a motion for new trial on the ground of ineffective assistance of counsel is a matter entirely within the trial court's discretion. *Cueva,* 339 S.W.3d at 856-57. Therefore, under the facts of this case, we will review the prongs of *Strickland v. Washington* through this abuse of discretion standard of review, reversing only if the trial court's decision was arbitrary or unreasonable. *Id.* at 857. To establish ineffective assistance of counsel, appellant must show: (1) his attorney's representation was deficient; and (2) there is a reasonable probability that, but for his attorney's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 684, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Salinas v. State,* 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Cueva,* 339 S.W.3d at 857. "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State,* 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). Because *Strickland's* first prong is dispositive of this point, we will limit our analysis to that prong. *See* TEX. R. APP. P. 47.1.

"Decisions rooted in strategy do not constitute deficient performance. Unless a defendant can show in the record that counsel's conduct was not the product of a strategic decision, a reviewing court should presume that trial counsel's performance

12

was constitutionally adequate unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Cueva*, 339 S.W.3d at 857-58 (citations omitted). Appellant's trial counsel testified at the hearing on appellant's motion for new trial. The court also admitted for consideration several documents, including a copy of the motion for new trial; affidavits from appellant, appellant's girlfriend and appellant's sister; a transcription of a recording of a conversation between the complainant and appellant's sister; a transcription and DVD copy of the forensic interview of complainant; a copy of an indictment and judgment against complainant's mother's former boyfriend, and a transcription of appellant's girlfriend's grand jury testimony. The trial court took the matter under advisement. Appellant's motion for new trial was later overruled by operation of law.

In his motion for new trial and on appeal, appellant contends his counsel was ineffective in several ways: (1) trial counsel had trouble hearing the testimony during trial; (2) he left at his office the only copy of a video where complainant recanted; and (3) he failed to call a member of appellant's family who would have contradicted basic elements of complainant's testimony. He further argued, "[i]n the alternative, [appellant] would submit that trial counsel erred at sentencing by failing to present adequate mitigation evidence and by failing to adequately dispute the sentencing allegations." On appeal, appellant includes a number of additional complaints about his counsel.

At the hearing, counsel was asked whether he has hearing problems and had them during trial. He answered, "Probably so. I know I had to ask witnesses numerous times to repeat what they were saying. And some of the times when they would repeat it, I wasn't really sure that I knew exactly what they were saying. My cross-examination

13

seemed to flow, and it appeared to me as I was asking the questions that I did understand it, but I don't really know." During cross-examination, counsel answered affirmatively when asked if he was able to communicate with appellant, witnesses and family members. On appeal, the State points out several instances during trial in which counsel asked a witness to repeat an answer and incorporated the answer into his next question, indicating he heard and understood the witness. We agree with the State's assessment.

We acknowledge appellant's argument on appeal his counsel was ineffective for failing to request a continuance due to his hearing issues. However, this was not explored at the hearing on appellant's motion for new trial and the record is silent on this point. We must assume counsel made a strategic decision not to ask for a continuance due to his hearing issues. Bone v. State, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) (stating counsel should ordinarily be accorded opportunity to explain actions before being condemned as unprofessional and incompetent).

Appellant next complains of counsel's failure at trial to offer into evidence a particular video. Counsel also testified he was aware prior to trial of the video appellant claims he should have offered at trial. He told the court, "I decided not to use it, and I could see that it would go either way. On the one hand, the child is saying something contrary to what she says in court. On the other hand, she's in a public place with someone asking her kind of leading questions about things that she would not want to admit around other people, I would imagine. And I felt like if we did that, it may be more damaging than helpful. I tried to cover the situation through cross-examination." On cross-examination at the hearing he agreed the decision was one of strategy. Counsel

14

is not required to perform flawlessly, and ineffectiveness is not established solely by the fact that a different trial strategy may have been pursued by another attorney in hindsight. *Muennink v. State*, 933 S.W.2d 677, 680 (Tex. App.—San Antonio 1996, pet. ref'd); *see Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) ("The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel," *cert. denied*, 133 S. Ct. 834 (2013)). We cannot find counsel provided ineffective assistance on this point.

Counsel also testified about his decision to refrain from calling appellant's sister as a witness. He stated, "I had had a discussion with the Defendant and we decided not to do that. It was a little bit of a value judgment, you might say, in how [appellant's sister] might appear on the stand, if she were to become overly outgoing or not. And I just decided that it would probably be better not to." He further testified, "I concluded that she was -- it was a little bit unpredictable as to what sort of emotional state she would be in and how she would respond to direct and cross." He also testified he decided not to call appellant's girlfriend because he believed "at the time that it would be counterproductive to do so." During cross-examination at the hearing, he told the court he and appellant discussed it and "jointly decided not to" call the girlfriend, although he could not recall the reasoning behind the decision. He did say he would "possibly" call the girlfriend if he had the trial to do over again, given the possibility of her testimony contradicting the complainant's version of events. We cannot say counsel's decisions were not reasonable or that he was deficient for making those choices. *See James v. State*, 997 S.W.2d 898, 902 (Tex. App.—Beaumont 1999, no pet.) (trial counsel's failure

15

to call every witness requested by defendant is irrelevant absent evidence defendant would have benefitted from testimony).

Appellant complains of counsel's decisions regarding objections and introduction of certain evidence. We agree with the State that to the degree appellant is arguing his counsel should have objected to multiple outcry witnesses, such an objection would have been improper. A teacher testified at trial to complainant's outcry of appellant's penile penetration while an investigator testified to her outcry of appellant's digital penetration. The outcry statute is event-specific, not person-specific, and there can be multiple outcry witnesses. *Broderick v. State*, 35 S.W.3d 67, 73 (Tex. App.—Texarkana 2000, pet. ref'd). Because the teacher and the investigator described different events, the testimony of both was admissible. The sexual assault nurse examiner testified to statements made to her for purposes of medical diagnosis or treatment. *See* TEX. R. EVID. 803(4). As to appellant's complaints that his counsel failed to utilize the forensic interview and phone calls of complainant to a greater degree, counsel's testimony at the hearing on the motion for new trial indicates his decision was again one of strategy. Thus, appellant has not demonstrated that counsel performed "below an objective standard of reasonableness" on this basis.

We reach the same conclusion concerning counsel's decisions regarding the punishment phase of appellant's trial. Counsel noted he thought about his approach to punishment but did not believe "it would be particularly helpful" to call members of appellant's family or other witnesses to testify during punishment or to present evidence of appellant's potential mental illness. *Perez v. State,* 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (also noting failure to call witnesses at the guilt-innocence and punishment

16

stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony).

Appellant further contends his trial counsel was ineffective because he failed to request a medical defense instruction to show his parental purpose in "checking" complainant. The medical-care defense is one of confession and avoidance. *Cornet*, 359 S.W.3d at 224-25; *Villa v. State*, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013). A defendant claiming entitlement to this defense must admit to each element of the offense, including both the act and the requisite mental state. *Villa*, 417 S.W.3d at 462. When the defensive evidence does no more than attempt to negate an element of the offense, a defendant is not entitled to a defensive instruction on any defense subject to the confession-and-avoidance doctrine. *Id. (citing Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007)). An instruction on a confession-and-avoidance defense is appropriate only when "the defendant's defensive evidence essentially admits to every element of the offense, including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct." *Id.* Given the state of the law and appellant's denial that he touched complainant[9] while "checking" her, the defense was inapplicable here and counsel was not ineffective for failing to request it.

Appellant also complains that his counsel elicited testimony regarding appellant's presence at complainant's school just before trial. At the hearing, counsel testified he chose to elicit this testimony because he believed the State would introduce it as evidence that appellant was attempting to intimidate complainant. His strategy was to

---

[9] As noted, an investigator testified appellant admitted he penetrated complainant on one occasion. But, evidence showed, appellant on another occasion denied he made this statement.

17

introduce it first. Again, appellant has not demonstrated that counsel performed "below an objective standard of reasonableness" on this basis.

We conclude appellant has failed to show any of the complained-of acts and omissions by his counsel fell below an objective standard of reasonableness. Accordingly, the trial court did not abuse its discretion in allowing appellant's motion for new trial to be overruled by operation of law. We overrule appellant's sixth, seventh, eighth and ninth points of error.

## Conclusion

Having overruled each of appellant's nine points of error, we affirm the judgment of the trial court.

James T. Campbell
Justice

Do not publish.

Denton Osborne
#1853817
Hodge Unit
379 FM 2972 W
Rusk, Tx 75785

RUSK TX
AUG
RUSK TX
FOREVER USA
FOREVER USA
FOREVER USA
FOREVER USA

